**ISG STATE OPERATIONS, INC., Appellant,**

v.

**NATIONAL HERITAGE INSURANCE COMPANY, INC., Appellee.**

No. 11–05–00359–CV.

Court of Appeals of Texas, Eastland.

Aug. 9, 2007.

Rehearing Overruled Sept. 13, 2007.

Charles E. Soechting, Gregory Finney, Neil C. McCabe, Stephen R. Walker, The O'Quinn Law Firm, Jett Williams, III, Davis Oretakey, P.C., Houston, for appellant.

Bobby M. Rubarts, Kim J. Askew, Robert Mow, Sean W. Fleming, Hughes & Luce, L.L.P., Dallas, Brittan Buchanan, Nick P. James, Van Osselaer, Cronin & Buchanan, Austin, for appellee.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

RICK STRANGE, Justice.

ISG State Operations, Inc. sued National Heritage Insurance Company, Inc. (NHIC) contending that NHIC breached a contract and fraudulently made precontractual and post-contractual misrepresentations. The trial court entered a directed verdict in NHIC's favor on ISG's fraudulent inducement cause of action, and the jury found for NHIC on ISG's breach of contract and common-law fraud claims. We affirm.

## I. *Background Facts*

NHIC, an Electronic Data Systems (EDS) subsidiary, was responsible for managing the State's medicaid program. Medical service providers submitted claims to NHIC for processing. It verified the claim and paid the provider on the State's behalf. In 1992, NHIC signed a Memorandum of Understanding with the Texas Department of Human Services and agreed to participate in a program promoting Historically Underutilized Businesses (HUBs). ISG is a minority-owned business and was certified as a HUB. In 1993, NHIC contracted with ISG's parent company to study possible outsourcing opportunities. Service providers submitted claims on paper and electronically. ISG recommended that paper and electronic claims processing be outsourced and that it be the recipient of that outsourcing. In 1994, NHIC and ISG executed a contract that subcontracted paper—but not electronic—claim processing to ISG.[1]

Problems soon developed. As part of the Subcontract, 137 claims-handling employees were transferred from NHIC to

ISG. NHIC made a fixed contract payment to ISG at the beginning of the month and a variable payment at the end of the month that was based upon the month's actual claim count. The claim count began decreasing, and NHIC's end-of-the-month payment decreased correspondingly. This created financial difficulties for ISG. On more than one occasion, ISG failed to timely pay its employees. NHIC advised ISG that this was a breach of the Subcontract and requested a corrective action plan. ISG instead contacted the Texas Department of Health and complained that NHIC's greed and manner of doing business was straining their future, that NHIC was acting out of racial jealousy, and that NHIC was forcing it out of business.

ISG's operations manager resigned in May 1994 because of disagreements with ISG's owner. The replacement manager resigned in September 1994. Several other employees and supervisors resigned because of work conditions. After the departure of the second operations manager, ISG was unable to meet the Subcontract's performance requirements. NHIC sent ISG notices of default, and on August 25, 1995, NHIC terminated the Subcontract for failure to timely process claims.

ISG sued NHIC and alleged that it was fraudulently induced into executing the Subcontract. ISG alleged that NHIC represented that it would receive future electronic claims work and that ISG detrimentally relied upon NHIC's representations by working on the Subcontract to the exclusion of all other work. ISG also asserted causes of action for common-law fraud and breach of contract. The trial court dismissed ISG's fraudulent inducement claim by directed verdict. The trial court submitted ISG's breach of contract and common-law fraud claims to the jury. The

---

1. Hereinafter the "Subcontract."

jury found against ISG, and the trial court entered a take nothing judgment in NHIC's favor.

## II. *Issues*

ISG raises three issues on appeal. First, it contends that the trial court abused its discretion by concluding that the merger clause precluded ISG's cause of action for fraudulent inducement based on NHIC's precontractual representations. Second, ISG argues that the trial court erred by granting NHIC's motion for directed verdict. Third, it claims that the trial court abused its discretion by excluding evidence of precontractual representations by NHIC.

## III. *Analysis*

*A. Did the Trial Court Err by Granting a Directed Verdict on ISG's Fraudulent Inducement Cause of Action?*

*1. The Trial Court's Rulings.*

The trial court held a pretrial hearing on the parties' motions in limine and granted NHIC's motion to preclude evidence of precontractual representations that were inconsistent with the Subcontract's merger clause.[2] After the jury was selected, ISG asked the trial court to reconsider this ruling. ISG argued that it was not offering evidence of precontractual representations to vary the terms of the Subcontract but to show that, both before and after the Subcontract's execution, NHIC promised that ISG would receive a separate contract for handling electronic claims. The trial court expressed a concern over parol evidence being used to vary the Subcontract's terms but indicated that ISG could offer evidence that NHIC had decided to give ISG a contract for electronic claims handling.

The following day, during a hearing to consider deposition testimony objections, ISG re-urged its position that the Subcontract's merger clause did not preclude a cause of action for fraudulent inducement based upon precontract representations. The trial court reaffirmed its decision that precontract representations were contractually excluded from consideration and deferred any ruling on post-contract representations pending the conclusion of ISG's case. When ISG rested, NHIC moved for directed verdict on ISG's fraudulent inducement cause of action. The trial court granted NHIC's motion noting: "I didn't hear any evidence of reliance because you were seeking benefit of the bargain."[3]

*2. Standard of Review.*

ISG frames its first issue by arguing that the trial court erred when it held that the Subcontract's merger clause precluded any fraudulent inducement claim for electronic claims processing.

---

2. The Subcontract included the following provision:

> Entire Agreement. This Subcontract, including any Schedules and documents referred to in this Subcontract or attached to this Subcontract and each Change Order, each of which is incorporated herein, constitutes the entire and exclusive statement of the agreement between the parties with respect to its subject matter and there are no oral or written representations, understandings, or agreements relating to this Subcontract which are not fully expressed herein. The parties agree that any other terms or conditions included in any shrink-wrap license agreements, quotes, invoices, acknowledgments, bills of lading, or other forms utilized or exchanged by the parties shall not be incorporated herein or be binding unless expressly agreed upon in writing by authorized representatives of the parties.

3. The trial court had earlier noted that, if ISG acted in response to NHIC's representations, it could recover any actual expenses incurred but that it could not recover for the benefit of a bargain that did not result in a written contract.

ISG's issue correctly states the reason articulated by the trial court for its ruling, but our review is necessarily broader. We must affirm the trial court's judgment—even if its rationale is erroneous—if it can be supported on any basis. *Cano v. N. Tex. Nephrology Assocs., P.A.*, 99 S.W.3d 330, 339 (Tex.App.-Fort Worth 2003, no pet.). Consequently, the burden on ISG is to show that no basis supports the trial court's decision. *See McKelvy v. Barber*, 381 S.W.2d 59, 62 (Tex.1964).

▆▆▆▆ A directed verdict for a defendant is appropriate when the plaintiff does not present evidence raising a fact issue essential to the plaintiff's right of recovery or when a plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000). We consider only evidence supporting ISG's case and disregard all contrary evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823–26 (Tex.2005). We must decide if there is any evidence of probative value that raises issues of fact on the material questions presented. *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004). If the evidence rises to a level to allow reasonable and fair-minded people to differ in their conclusions, it constitutes more than a scintilla of evidence, an instructed verdict is improper, and the case must be reversed and remanded. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex.2004). Where no evidence of probative force on an ultimate fact element exists or where

the probative force of the testimony is so weak that only a mere surmise or suspicion is raised as to the existence of essential facts, an instructed verdict is appropriate. *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 160 (Tex.App.-El Paso 1996, writ denied).

### 3. ISG's Fraudulent Inducement Claim.

▆▆▆▆ ISG alleged that NHIC made a number of fraudulent misrepresentations to induce it to enter into the Subcontract and to take a number of related actions. To establish a fraudulent misrepresentation, ISG was required to prove:

(1) NHIC made a material representation;

(2) the representation was false;

(3) when the representation was made, NHIC knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;

(4) NHIC made the representation with the intent that ISG act upon it;

(5) ISG acted in reliance on the representation; and

(6) ISG thereby suffered injury.

*Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). Because ISG alleged fraudulent inducement as opposed to common-law fraud, ordinary detrimental reliance is insufficient. Instead, ISG was required to show that it was induced into executing a contract. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex.2001).[4]

---

**4.** *See also James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 442 (Tex. App.-Dallas 2006, no pet.) (fraudulent inducement is a particular species of fraud that arises only in the context of a contract and requires an enforceable contract as part of its proof); *John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 24 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (because plaintiff never entered into a binding sales contract, it had no fraudulent inducement cause of action); *Coastal Corp. v. Atlantic Richfield Co.*, 852 S.W.2d 714, 720 (Tex.App.-Corpus Christi 1993, no writ) (because buyer did not enter into binding contract with seller, it did not rely on any representation to its detriment).

ISG's fraudulent inducement claim would normally bring the Subcontract's validity into question because a fraudulently induced party has not assented to the agreement. *See Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 289 (5th Cir.2002).[5] However, ISG did not seek rescission of the Subcontract—in fact its breach of contract claim was based upon it—and ISG conceded during oral argument that there was no evidence that it would not have executed the Subcontract but for NHIC's representations regarding electronic claims. Rather, ISG is attempting to use fraudulent inducement as a vehicle to recover the expected profits from a second, unexecuted agreement.[6] ISG told the trial court that it was induced to sign the Subcontract with a promise that it "would be given another separate, distinct contract to handle electronic claims."

■ Texas courts have held that misrepresentations concerning future contracts can support a *fraud* cause of action. *See, e.g., Hoechst Celanese Corp. v. Arthur Bros., Inc.*, 882 S.W.2d 917 (Tex.App.-Cor-

pus Christi 1994, writ denied). In *Hoechst*, the parties entered into a nine-month contract to perform maintenance services at a chemical plant. The contractor alleged that the plant owner misrepresented its intention to award a long-term contract if the contractor's level of service improved, that it spent considerable sums in reliance on this promise, and that it lost profits in other areas of operation because of the time spent focused on the maintenance contract. The jury found for the contractor, and the court found sufficient evidence supporting its liability findings and an out-of-pocket damage award. *Id.* 882 S.W.2d at 928. The court also held that lost profits were recoverable—so long as they were not speculative and were traceable directly to the fraud—but found insufficient evidence supported their award in this case. *Id.* at 929.

ISG's damage model exceeds the *Hoechst* contractor's claim because it does not seek profits collaterally lost due to underlying events, but the profits it expected to receive from a future contract.[7]

---

5. *See also Formosa*, 960 S.W.2d at 46 (as a rule a party is not bound by a contract procured by fraud); *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex.1995) (a buyer is not bound by an agreement to purchase that it was fraudulently induced to execute).

6. We recognize that courts have held that a party can assert fraudulent inducement as a defense to a breach of contract action and still assert a counterclaim for fraud damages. *See, e.g., Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 209–10 (Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Roberts v. Tipton*, 562 S.W.2d 921, 923 (Tex.Civ.App.-Waco 1978, writ ref'd n.r.e.). Neither case, however, discusses what damages are recoverable. In *Anderson*, the jury found fraud but awarded no damages. In *Roberts*, the jury found that a fraudulent misrepresentation was made but apparently was not asked to determine anything other than contractual damages.

7. We note, however, that ISG made the following offer of proof:

If allowed to testify on the subject, Mr. Blow would further testify that he relied upon the representations made to him by I—NHIC *regarding their decision to give him electronic claims for processing, by refraining from looking for business from sources other than NHIC. And that that was done at NHIC's specific request or instruction that he refrain from looking for business elsewhere.*

He also maintained personnel and staff and paid them salaries in anticipation of those—the personnel and staff assuming responsibilities directly related the handling and processing of the promised electronic claims.

This sounds much like the type of restitution damages recoverable in *Hoechst* for common-law fraud, but we need not determine if they are recoverable here because ISG disclaimed out-of-pocket damages before both the trial court and this court. *See Haase*, 62 S.W.3d at

ISG argues that it was entitled to seek either out-of-pocket or benefit-of-the-bargain damages and that benefit-of-the-bargain damages can include reasonably certain lost profits and points to evidence that it anticipated receiving 18.4 million dollars per year from an electronic claims contract. However, ISG has not cited, and in our research we have been unable to locate, a case allowing lost profits for an unexecuted contract based upon a fraudulent inducement claim. When lost profits were awarded, they were attributable to the fraudulently induced contract. For example, in *Formosa Plastics*, 960 S.W.2d 41, a contractor submitted a bid based upon representations contained in a bid package. Many of these representations were false, and there was evidence that the contractor knowingly made them with the intention of inducing the contractor to enter into a contract at a low bid price. *Id.* at 48. The court held that the contractor could recover tort damages for a fraudulent inducement claim but only for the profits that would have been made if the bargain had been performed as promised. *Id.* at 47, 50. The court remanded the case for a new trial because it found that the contractor's damage testimony was speculative. The contractor developed a damage model based upon what he would have bid had he known the truth. The court held that this was improper. The contractor could not unilaterally develop a new contract but was required to conform his damages to the actual facts because the

benefit-of-the-bargain measure of damage does not compensate for "a hypothetical bargain never struck." *Id.* at 50.[8]

■ Most recently, in *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007), the court held that the viability of a fraud claim depends upon the nature of the damages sought. A fraud claimant can recover restitutional damages for out-of-pocket expenses caused by the fraud; however, when seeking benefit-of-the-bargain damages arising from a contractual relationship, a statute-of-frauds defense that bars a contractual recovery also bars a fraud recovery. In *Sonnichsen*, the claimant's damages were the benefits he expected to receive from continued employment at Baylor. Because he had no enforceable employment contract, the court concluded that his fraud claim was barred as well. *Id.*

■ The supreme court's analysis makes clear that the basis of any fraudulent inducement claim must be an executed contract that was procured by fraud, without which would not have been executed, and the damages sought must flow directly from *that* contract. The absence of any testimony that the Subcontract would not have been executed but for NHIC's misrepresentations is fatal to ISG's fraudulent inducement cause of action. *See Haase*, 62 S.W.3d at 798. Moreover, because ISG's damage model was the profits it anticipated earning from an unexecuted contract, it failed to offer evidence of recoverable damages.[9] Issue two is overruled.

799 (the measure of damages for fraud and fraudulent inducement are not interchangeable).

8. ISG similarly cites *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 725 (Tex.App.-Houston [1st Dist.] 1984, no writ), for the proposition that benefit-of-the bargain damages may include reasonably certain lost profits. In this case, the parties contracted for the sale of residential lots. The

jury found that Community Development breached the contract. Replacement Parts's damages included the profits it anticipated making from lot sales. Because those sales were the subject of the contract and not an expected future contract, this decision is consistent with our analysis.

9. We note also that ISG failed to offer sufficient evidence either before the jury or by offer of proof to establish a lost profits claim.

### B. Did the Trial Court Err When It Excluded Evidence of Precontractual Representations Regarding Electronic Claims?

#### 1. Standard of Review.

 The admission and exclusion of evidence are committed to the trial court's sound discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *State Bar of Tex. v. Evans,* 774 S.W.2d 656, 658 n. 5 (Tex.1989). The court should not reverse a trial court for an erroneous evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1; *see also Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989). In making this determination, we review the entire record. *Alvarado,* 897 S.W.2d at 754.

#### 2. ISG's Offer of Proof.

The trial court held that the merger clause precluded evidence of precontractual representations. ISG made an offer of proof and established that, if allowed, EDS's former national minority business manager would testify that, during the Subcontract's negotiations, he heard NHIC's Austin manager tell ISG's owner, Kenneth Blow, that ISG would receive a separate contract for electronic claims. ISG also established that Blow would testify that NHIC represented to him prior to the Subcontract's execution that he would receive a contract for electronic claims processing. ISG argues that the trial court erred by excluding this evidence because it was not offered to contradict or vary the terms of the Subcontract but was offered to establish a collateral undertaking.

#### 3. Analysis.

 Generally, the parol evidence rule circumscribes the use of extrinsic evidence when interpreting an integrated document.[10] *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). When, as here, a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence. *Barker v. Roelke,* 105 S.W.3d 75, 83 (Tex.App.-Eastland 2003, pet. denied). This rule, however, is not without exception.[11] A merger clause can be disre-

Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Miga v. Jensen,* 96 S.W.3d 207, 213 (Tex.2002). ISG's evidence was its expected gross receipts.

**10.** An agreement is "integrated" when "the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted." RESTATEMENT (FIRST) OF CONTRACTS § 228 (1932). A contract may be fully or partially integrated. A fully integrated contract is a final and complete expression of all the terms in the agreement. A partially integrated contract is a full and complete expression of the terms contained in that agreement but is not a final and complete expression of all the terms agreed upon between the parties. *See* David R. Dow, *The Confused State of the Parol Evidence Rule in Texas,* 35 S. TEX. L.REV. 457, 459–60 (1994). The author notes that parties will typically include a merger clause to express their intention of creating a fully integrated document. *Id.* at 460.

**11.** The parol evidence rule also has exceptions. Extrinsic evidence is admissible to show (1) the execution of a written agreement was procured by fraud, (2) an agreement was to become effective only upon certain contingencies, or (3) the parties' true intentions if the writing is ambiguous. *Gonzalez v. United*

garded upon pleading and proof of ambiguity, fraud, or accident. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex.App.-Fort Worth 1997, pet. denied). It also does not prohibit evidence of a collateral agreement. *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 179 n. 10 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

The Houston Court described a "collateral agreement" as "one that the parties might naturally make separately, *i.e.*, one not ordinarily expected to be embodied in, or integrated with, the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it." *Id.; see, e.g., Transit Enters., Inc. v. Addicks Tire & Auto Supply, Inc.*, 725 S.W.2d 459, 461 (Tex.App.-Houston [1st Dist.] 1987, no writ). Addicks filed suit alleging that Transit breached a written contract for the purchase of a tow truck by failing to make its scheduled payments. At trial, Addicks was allowed to introduce evidence of an oral agreement that this truck would be used exclusively to tow for and to Addicks. The court noted that these exclusive use agreements were common in the industry, that the oral agreement did not vary or contradict the terms of the written contract, and that it was offered only as a defense to Transit's counterclaim for wrongful sequestration.

■ The application of the collateral agreement exception is a function of the integration present in the executed contract. If a contract is only partially integrated, admission of an oral agreement not inconsistent with the terms of the written contract comports with the parol evidence rule. Dow, 35 S. Tex. L.Rev. at 464–65. But, if a contract is fully integrated, courts

have been more stringent in their application of the parol evidence rule. *See, e.g., Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169 (5th Cir.1990).[12]

In *Toys "R" Us*, the parties contracted for the construction and installation of signs at new Toys "R" Us stores. A dispute arose, and the parties met to discuss their disagreement. During the meeting, the parties reached an oral agreement. A Toys "R" Us representative subsequently prepared a letter summarizing their agreement. The letter indicated that the sign vendor would continue as the vendor for ten stores but that the remainder of the parties' contracts would be canceled with no further liability to either party. *Id.* at 171–72. The vendor's owner signed the letter and returned it with an addendum that referred to the disposition of stored material, shipping costs and procedures, and miscellaneous service and repair work. The addendum made no reference to the release or the presence of any other agreements. *Id.* at 172.

Subsequently, the vendor submitted a bid for the Toys "R" Us 1986 sign program. Toys "R" Us did not select the vendor's bid, and the vendor filed suit seeking lost profits for work covered by the prior contracts. The vendor claimed that the settlement agreement released Toys "R" Us from liability under the prior contracts in exchange for an oral promise from Toys "R" Us to make it a major sign vendor in 1986. The vendor argued that, because it did not receive the 1986 contract, the release language was no longer binding. *Id.* at 172–73.

The Fifth Circuit disagreed and wrote that, when parties reduce their agreement

*Bhd. of Carpenters & Joiners of Am., Local 551*, 93 S.W.3d 208, 211 (Tex. App–Houston [14th Dist.] 2002, no pet.).

12. One commentator has noted that the effect of admitting a collateral agreement is to conclude that the underlying agreement is only partially integrated. Dow, 35 S. Tex. L.Rev. at 460 n. 15.

to writing, "they are presumed to have selected from [prior] negotiations only the promises and agreements for which they choose to be bound." *Id.* at 173. The court recognized the collateral agreement exception but held that an oral agreement for future business did not fall within it because there was no evidence that the Toys "R" Us promise to provide future work was given for separate consideration, because a promise of future business was not one that might normally be made as a separate agreement under these circumstances, and because the vendor's position was inconsistent with the settlement agreement's clear release language. *Id.* at 175–76.[13]

We believe the same situation is present here. The Subcontract's merger provision unambiguously indicates that the agreement is fully integrated. The agreement provides:

This Subcontract, including any Schedules and documents referred to in this Subcontract or attached to this Subcontract and each Change Order, each of which is incorporated herein, constitutes the entire and exclusive statement of the agreement between the parties with respect to its subject matter and there are no oral or written representations, un-

derstandings, or agreements relating to this Subcontract which are not fully expressed herein.

ISG argues that the merger provision is not applicable because the oral representations of a future contract for electronic claims handling are not inconsistent with the Subcontract and because the Subcontract and the promised contract dealt with different subjects. ISG has shown no separate consideration existed for the promise to enter into a future contract,[14] and the record does not support a finding that this is such an agreement as might naturally be made as a separate agreement by parties situated as were ISG and NHIC.

The Texas Supreme Court considered the enforceability of a contractual disclaimer clause in *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177–80 (1997). The court held that a disclaimer-of-reliance provision in a settlement agreement barred a fraudulent inducement cause of action because it negated any detrimental reliance. ISG argues that this case is inapplicable because it dealt with a settlement release drafted to resolve an ongoing dispute. We disagree. Nothing in the court's opinion suggests its analysis is limited to settlement agreements.[15] The

---

**13.** The court utilized Restatement (First) of Contracts § 240 (1932) for the factors to consider when determining if the collateral agreement exception applied because the Texas Supreme Court adopted this provision in *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30, 32 (Tex.1958). Section 240 provides:

An oral agreement is not superseded or invalidated by a subsequent or contemporaneous integration, nor a written agreement by a subsequent integration relating to the same subject-matter, if the agreement is not inconsistent with the integrated contract, and
 (a) is made for separate consideration, or
 (b) is such an agreement as might naturally be made as a separate agreement by parties

situated as were the parties to the written contract.

**14.** This does not mean that, had the parties executed a second contract, it would have failed for lack of consideration. It merely means that there is no evidence of separate consideration for the promise to execute a second contract.

**15.** Texas courts have applied *Schlumberger* to resolve disputes over bank syndicate agreements, *see Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840, 844–45 (Tex. App.-Houston [1st Dist.] 2004, no pet.); acquisition and employment agreements, *see IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 128 (Tex.App.-Houston [14th

court did spend considerable time discussing the parties' dispute and settlement, but it did so in light of the requirement that "[t]he contract and *the circumstances surrounding its formation* determine whether the disclaimer of reliance is binding." *Id.* at 179 (emphasis added).

These circumstances establish that the Subcontract was extensively negotiated by sophisticated business people and that the negotiations extended beyond paper claim processing. Blow testified that the negotiations involved numerous sessions over several days. ISG was represented by experienced counsel, and Blow was assisted by three knowledgeable business advisors. Multiple drafts of the agreement were prepared, and changes were made until just before the Subcontract's execution. ISG's original proposal recommended outsourcing both paper and electronic claims processing. During the negotiations, ISG requested an option to acquire electronic claims processing if it met performance standards after six months. In light of these circumstances, it was reasonable for the trial court to conclude that the merger clause's scope was broader than paper claim processing discussions and that the parties intended the Subcontract to fully express their agreement.

Moreover, ISG's position does present an inconsistency. The merger clause is broadly written and disclaims any other agreement *relating* to the Subcontract. ISG's original study considered and recommended outsourcing both paper and electronic claims processing, and both were discussed while negotiating the Subcontract. The parties ultimately contracted only for paper claims processing by ISG, but the Subcontract refers to electronic claims processing and provides that these will be handled by NHIC. Consequently, the trial court could reasonably conclude that paper claim processing and electronic claim processing were related. To accept ISG's position that the parties engaged in considerable effort to negotiate and draft a written contract for paper claims processing, represented in that contract that there were no other agreements, and nonetheless still had an oral agreement potentially worth millions of dollars for a future electronic claims contract, would require that we significantly restrict the application of the parol evidence rule and the integration doctrine. As the Fifth Circuit noted:

> Both the parol evidence rule and the doctrine of integration exist so that parties may rely on the enforcement of agreements that have been reduced to writing. If it were not for these established principles, even the most carefully considered written documents could be destroyed by "proof" of other agreements not included in the writing.

*Id.* at 176. This we cannot do.

The trial court did not err when it excluded evidence of precontract representations. ISG's third issue is overruled. Because we have also affirmed the trial court's directed verdict on ISG's fraudulent inducement claim, this holding establishes that the trial court did not err in its construction and application of the Subcontract's merger clause, and ISG's first issue is also overruled.

## IV. *Holding*

The judgment of the trial court is affirmed.

Dist.] 2003, pet. denied); and real estate contracts, *see The Woodlands Land Development*

*Co. v. Jenkins*, 48 S.W.3d 415, 420–22 (Tex. App.-Beaumont 2001, no pet).